**Affirmed and Opinion Filed February 10, 2015**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-01759-CR

**NICHOLAS DAVIS, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 292nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F12-58570-V**

## MEMORANDUM OPINION
Before Justices Francis, Evans, and Stoddart
Opinion by Justice Francis

Nicholas Davis appeals his conviction for the murder of his uncle, Ricky Garcia. After finding appellant guilty and making a deadly weapon finding, the jury assessed punishment at thirty years in prison. In two issues, appellant claims the evidence is insufficient to support his conviction and the trial court erred by failing to properly instruct the jury. We affirm.

In his first issue, appellant claims the evidence is insufficient to support his conviction and the jury's rejection of his self-defense claim. In assessing the sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We

may not substitute our judgment for that of the fact finder. *See Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). When an appellant challenges the legal sufficiency of the evidence supporting a jury's rejection of a self-defense claim, we do not look to whether the State presented evidence refuting appellant's self-defense testimony; rather we determine whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the offense "beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).

A person commits an offense if he intentionally or knowingly causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011). A person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. *Id*. § 9.31(a). A person is justified in using deadly force against another if the actor would be justified in using force against another under section 9.31 and when and to the degree the actor reasonably believes the deadly force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force. *Id*. § 9.32(a).

The indictment and jury charge alleged that, on or about July 30, 2012, appellant (1) intentionally or knowingly caused Garcia's death by shooting Garcia with a firearm, a deadly weapon, or (2) intended to cause serious bodily injury to Garcia and committed an act clearly dangerous to human life, shooting Garcia with a firearm, that caused Garcia's death. The charge instructed the jury on self defense as defined by the penal code and outlined above.

At trial, Ariadna Kubota said she was married to Garcia, and they had two children. The couple divorced but later tried to reconcile. Kubota and the children moved into Garcia's apartment in Pleasant Grove where Garcia's sister, Jenny Davis, also lived with her three

children, Marcella, William, and appellant. On Friday night, July 27, 2012, Garcia, Kubota, and Davis went to a bar with friends. Appellant babysat the Garcia children at the Garcia apartment. About forty-five minutes after arriving at the bar, Kubota got a call from neighbors, telling her that their apartment door had been kicked in. She asked about the children but was told no one was in the apartment except the police. The three rushed back to the apartment and discovered the Garcia children were at Davis's apartment with Marcella. Appellant was not there.

Garcia and Kubota returned to their apartment and, while they were cleaning up, appellant, Marcella, and two of appellant's friends, Brandon Nash and Brandon Fisher, showed up. Fisher and Marcella were also dating. When Garcia and Kubota asked appellant why he left their apartment, appellant told them he took their son to Marcella to stop his crying. As the evening progressed, Garcia became suspicious that appellant was somehow involved in the burglary. He also suspected Nash and Fisher were involved because the three were close friends and often spent time together. After talking to a neighbor the following day, Garcia went to Davis's apartment and confronted appellant about the break-in. Garcia brought Davis and appellant back to his apartment where the discussion continued. When appellant denied that he and his friends were involved, Garcia grabbed a steak knife, drove it into the table, and threatened appellant, saying he would "hurt him" if he was lying. Appellant and his mother left.

Garcia's other sister, Angela Ramirez, stopped by the Garcia apartment on Saturday and invited Garcia and his family to spend the day at her house on Sunday. The family went and did not return to their apartment until around 2:00 a.m. When they got home, Garcia helped Kubota get the children in the house, then told her he was going to walk the dog. After he was gone "for quite a while," Kubota went outside for a cigarette and heard Davis screaming, "[N]o, Ricky, get up, get up, no." Kubota ran toward Davis's apartment and saw Ricky Garcia lying on the ground. Davis grabbed her and said she "didn't have nothing to do with this." Kubota ran to

Garcia who was bleeding and struggling to breathe. She asked who shot him, and he said, "Nico," which is what they called appellant. Police arrived and, when they asked him what happened, he said, "My nephew shot me." Garcia died shortly thereafter.

Fisher said he, Nash, and appellant were friends and spent a lot of time together. They spent July 30th at appellant's apartment. Around 2:00 or 3:00 a.m., they were in Marcella's room, playing video games, when someone started banging on the door. Nash opened the door, and Garcia "bum-rushed in." He was carrying a Styrofoam cup and headed straight to the kitchen where he started cooking a hamburger. Appellant stayed in Marcella's room but Fisher walked down the hallway to see what was going on. Nash asked Garcia why he was there. Garcia walked out of the kitchen with the frying pan and a cooking utensil in his hand; he said something to Nash but Fisher could not hear what it was. Garcia went back into the kitchen, and Nash walked toward Marcella's room, saying he was "fixing to call my daddy." Fisher followed Nash, and they passed Davis in the hallway on her way to the kitchen. Appellant was standing in the doorway of Marcella's room. Fisher and Nash walked into Marcella's room and sat on the bed. Garcia, whose hands were empty, walked toward appellant and said, "If I found out something – you had something to do with it . . ." He then slapped appellant. Appellant said, "Move, momma," and Fisher heard about five gunshots. By the time Fisher got to the door of Marcella's room, Garcia was outside, falling down the stairs. Appellant ran away.

Nash said he had known appellant for about five or six years and had met him through his girlfriend, Marcella. He, Fisher, and appellant spent "every day" together. During the early hours of July 30, the three were at appellant's apartment playing video games. Sometime after two in the morning, they heard banging on the door. Appellant went to the door but came back without answering. According to Nash, appellant was "shaking like he's terrified" and said it was his uncle. The banging continued until Nash answered the door. Although he barely

cracked the door open, Garcia "barged in" and walked in the house. Garcia told Nash "[Y]'all got me fucked up. Y'all think this shit is funny. Y'all know what's been going on." He then walked in the kitchen and started cooking himself a hamburger. Appellant and Fisher came in the living room; Garcia walked out of the kitchen with the frying pan and a knife and repeated his previous comments.

Nash decided to call his father and walked toward Marcella's room. Fisher followed him into Marcella's room. Appellant was standing in the doorway outside his mother's bedroom door. Nash heard Garcia tell appellant, "[I]f I find out you had something to do with it, I'm going to fuck you up" and saw Garcia slap appellant with one hand; he could not see the other hand. Within seconds of the slap, he heard gunshots. According to Nash, the shots "came off pretty fast," and while appellant was shooting, he said, "Move, momma."

During cross examination, Nash stated he did not remember a lot of details about that night because he smokes a lot of "[w]eed, marijuana." After reviewing his videotaped interview taken hours after the shooting, he conceded he told police that, right before Garcia slapped appellant, he told Nash and Fisher, "I feel in my heart y'all didn't have anything to do with it."

Davis contradicted Kubota's testimony about Garcia's and appellant's interaction at the apartment on Saturday. She claimed Garcia put the knife to appellant's neck and threatened him but did not stick the knife in the table. She said both she and appellant were scared by his actions and left. With respect to the morning Garcia died, she said she woke up when she heard loud arguing in her apartment. Garcia, known for having a short temper and being violent, was there and was drunk. Davis walked in the kitchen and saw a hamburger patty burning on the stove, so she took it out of the pan and made a sandwich for her brother. Nash and Garcia were arguing in the hallway so she walked toward them and saw Garcia slap appellant. Davis said "Then [Garcia] walked down the hallway and I was walking behind him and [appellant] started

–5–

shooting and he said, 'Momma, move," and I moved out of the way . . . [appellant] shot him and he fell to the ground . . . He got up and he struggled to the door and opened the door and he fell down the stairs." Although she initially said she was walking behind Garcia when the shooting started, during cross examination she said Garcia was walking toward her and away from appellant when the shooting started. On redirect, she said Garcia was facing appellant when he started shooting. Davis did not recall seeing anything in Garcia's hand at the time he slapped appellant.

Medical examiner Read Quinton said Garcia, who weighed 312 pounds, was shot five times: once in the right shoulder, twice in the upper left abdomen, once in the right abdomen, and once in the upper left side of the back. The gunshot in the right shoulder traveled downward from right to left and hit both lungs and the heart, ending up in the abdomen. The bleeding from this wound was mostly internal and, although not an "immediately fatal gunshot wound," this was "not survivable . . . without immediate massive surgical intervention." Quinton also ran toxicology on blood specimens, and Garcia's blood alcohol concentration was .159; he had no drugs in his system.

Appellant argues the evidence he acted in self defense is overwhelming, primarily because Garcia was a large drunk man, known for his temper and acting violently, who had previously threatened appellant with a knife. However, according to two eyewitnesses, Garcia did not have anything in his hands at the time he was shot. All three witnesses said Garcia slapped appellant who immediately shot Garcia five times. Davis said Garcia was walking away from appellant when he was shot, and the medical examiner noted Garcia was shot in the back as well as in his abdomen and shoulder. After viewing all the evidence in the light most favorable to the prosecution, we conclude any rational trier of fact would have found the essential elements

of murder and the same rational trier of fact would have found against appellant on the self-defense issue. *See Saxton*, 804 S.W.2d at 914. We overrule appellant's first issue.

In his second issue, appellant claims the trial court erred by failing to instruct the jury on the presumption of reasonableness of deadly force in the self-defense paragraph of the charge.

When addressing a claim of jury charge error, we first decide whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If we find error, we then analyze that error for harm. *Id*. Preservation of charge error does not become an issue until we assess harm. *Id*. Under *Almanza*, jury charge error requires reversal when the defendant has properly objected to the charge and we find "some harm" to his rights. *Id*.; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g). When the defendant fails to object or states that he has no objection to the charge, we will not reverse for charge error unless the record shows "egregious harm" to the defendant. *Ngo*, 175 S.W.3d at 743. We first turn to whether error exists.

As noted previously, a person is justified in using deadly force against another if, among other things, the actor "reasonably believes the deadly force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force." TEX. PENAL CODE ANN. § 9.32(a)(2). The actor's belief that the deadly force "was immediately necessary" as described by subdivision(a)(2) is presumed to be reasonable if the actor:

> (1) knew or had reason to believe that the person against whom the deadly force was used:
> > (A) unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment;
> > (B) unlawfully and with force removed, or was attempting to remove unlawfully and with force, the actor from the actor's habitation, vehicle, or place of business or employment; or
> > (C) was committing or attempting to commit [aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery];
> (2) did not provoke the person against whom the force was used; and

> (3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

TEX. PENAL CODE ANN. § 9.32(b). When a rule or statute requires an instruction under a particular set of circumstances, that is "the law applicable to the case," and the trial court must instruct the jury accordingly. *Oursbourn v. State*, 259 S.W.3d 159, 180 (Tex. Crim. App. 2008). A defensive issue is not law "applicable to the case" unless the defendant timely requests the issue or objects to the omission of the issue in the jury charge. *Id*. (citing *Posey v. State*, 966 S.W.2d 57, 61−63 (Tex. Crim. App. 1998)).

Here, there is no record of the charge conference or of what instructions, if any, appellant objected to or requested. Although the trial court is required to instruct the jury on the self-defense presumption of reasonableness when the evidence raises it, we nevertheless conclude the trial court did not err by not doing so in this case. There is no evidence Garcia was committing or attempting to commit murder when appellant shot him. Rather, the evidence shows that, although he had threatened appellant two days earlier, Garcia slapped appellant's face and was walking away when appellant shot him five times. The evidence also shows Garcia had no weapon in his hand at the time he was shot. Under these circumstances, we cannot conclude the trial court erred by failing to instruct the jury on the presumption of reasonableness in the self-defense instruction. We overrule appellant's second issue.

We affirm the trial court's judgment.

Do Not Publish
TEX. R. APP. P. 47.2(b)
131759F.U05

/Molly Francis/
MOLLY FRANCIS
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

NICHOLAS DAVIS, Appellant

No. 05-13-01759-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the 292nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F12-58570-V.
Opinion delivered by Justice Francis,
Justices Evans and Stoddart participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 10th day of February, 2015.